Trenton R. Kashima (SBN No. 291405)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

*Attorneys for Plaintiffs and the Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNE FOSTER and MADELEINE ROGOW individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITRUS WORLD, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Anne Foster and Madeleine Rogow ("Plaintiffs") bring this Class Action Complaint against Defendant Citrus World, Inc. ("Defendant" or "Citrus World") individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including an investigation conducted by their attorneys:

## NATURE OF THE ACTION

1.      Plaintiffs bring this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Florida's Natural 100% Premium Orange Juice, No Pulp (the "Product"), which is a prominently labeled as being "Natural" and containing "100% Premium Orange Juice" In reality, Plaintiffs' testing has revealed that the Product contains per- and polyfluoroalkyl  substances ("PFAS"), a category of synthetic chemicals that are, by definition, not "Natural."

2.      PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[1]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affects human health. Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[2]

4.      Defendant formulates, manufactures, markets, and sells the Product, which they uniformly represent as "100% Premium Orange Juice" which is made from "Natural" ingredients.

5.      As the producer of some of the most widely recognized brands in the world,

---

[1] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[2] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (Last Accessed November 18, 2022)

Defendant knows the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Product.

6.     Defendant's uniform marketing is intentionally designed to drive sales and increase profits by targeting health-conscious consumers—and specifically, conscientious consumers—who reasonably believe that the Product is free from ingredients which are artificial or otherwise unnatural.



7.     Defendant represents the Product as containing "nothing in here but 100% pure orange juice. (Not even a shred of pulp—so relax, kids!) Squeezed from fresh oranges, grown

CLASS ACTION COMPLAINT

with care. Naturally. It's 100% premium. 100% delicious".[3]

8.      However, despite Defendant's consistent and pervasive marketing representations to consumers that their Product is a healthy, all-natural orange juice, Plaintiffs' independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

9.      The presence of PFAS is entirely inconsistent with Defendant's uniform representations that the Product is "Natural" and "100% premium".

10.     Further, the presence of PFAS in the Product renders it adulterated, misbranded, and illegal to sell under federal and state law.

11.     Prior to placing the Product into the stream of commerce and into the hands of consumers to ingest, Defendant knew or should have known that the Product contained PFAS, but Defendant misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class Members, by not including PFAS on the Product's labels or otherwise warning about its presence.

12.     Plaintiffs and Class Members relied on Defendant's representations that the Product was "Natural", safe, unadulterated, and free of any potentially harmful ingredients that are not listed on the label.

13.     Plaintiffs and Class Members purchased and consumed the Product and were therefore exposed to (or risked being exposed to) the harmful PFAS in the Product.

14.     As a result of Defendant's misconduct, Plaintiffs and putative Class Members have suffered injury in fact, including economic damages.

15.     Accordingly, Plaintiffs brings their claims against Defendant individually and on behalf of a Class of all others similarly situated for (1) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; (2) violation of CLRA Civil Code section 1750 *et seq*.; (3) breach of express warranty; (4) fraud; (5) constructive fraud; and (6) unjust enrichment.

---

[3] https://www.floridasnatural.com/our-juices/orange-juices/orange-no-pulp (last visited March 27, 2023).

CLASS ACTION COMPLAINT

## PARTIES

16.     Plaintiff Anne Foster is a citizen of California who resides in Petaluma, Sonoma County.

17.     Plaintiff Madeleine Rogow is a citizen of California who resides in Venice, Los Angeles County.

18.     Defendant Citrus World, Inc. is a Florida corporation with its corporate headquarters in Lake Wales, Florida.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Defendant because Defendant has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the state of California.

21.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, specifically, Plaintiff Anne Foster's purchase of the Product occurred in this District.

## FACTUAL ALLEGATIONS

***Defendant's Business***

22.     The U.S. market for non-alcoholic beverages was $447.38 billion in 2022[4]. Defendant has sought to differentiate themselves in the refrigerated beverage market by selling a

---

[4] https://www.zippia.com/advice/us-beverage-industry-statistics/ (last visited April 21, 2023).

CLASS ACTION COMPLAINT

"Natural" orange juice that is an alternative to soda and other drinks that contain added sugar.

23.     In recent years, Defendant has tailored the marketing of the Product to appeal to health-conscious consumers by highlighting the fact that it contains "Natural" ingredients and is the "highest quality juice you can find" that is sourced from "tree to table."[5]

24.     Defendant sells the Product at mass market retailers, grocery stores, and online retailers throughout the United States.

***Defendant's False and Deceptive Advertising***

25.     The Product is an orange juice which is uniformly represented across all marketing channels as a "Natural" juice drink, beginning first with the Product's brand name: Florida's Natural (the "Natural Representations").

26.     The Product's packaging is replete with representations designed to convince consumers that it is a healthy choice, beginning with the Product's logo, which appears without fail on the Product's front label, and prominently includes the word "Natural." Defendant intentionally includes this term in their brand name in order to convince reasonable consumers that its products are free from any synthetic chemical ingredients.

27.     Defendant does not disclose the presence of PFAS—or any other synthetic chemical—in the Product's ingredients. Rather, Defendant further bolsters its "Natural" claims with a short and sweet ingredient list:[6]

**INGREDIENTS:**
Water, Pasteurized Orange Juice,
Concentrated Orange Juice.

Contains juice from
Florida and Mexico

28.     Consumers encounter the Natural Representation on the Product's front label.[7]

---

[5] https://www.floridasnatural.com/our-story (last visited March 27, 2023).
[6] https://www.floridasnatural.com/our-juices/orange-juices/orange-no-pulp (last visited March 27, 2023).
[7] *Id.*

CLASS ACTION COMPLAINT



29.    Thus, it is undisputable that the Product is uniformly represented across all marketing channels— including the Product's front label, where it cannot be missed by consumers— as containing <u>only</u> natural ingredients.

30.    The side panel of the Product contains another "Natural" representation that reinforces the "Natural" representation that's on the front of the Product label.



CLASS ACTION COMPLAINT

31.    Nothing on the Product's package or labeling indicates that the Product contains artificial or synthetic ingredients, let alone toxic man-made chemicals.

32.    Accordingly, based on Defendant's uniform Natural Representations, which are present on the Product's packaging and carried through all of its related marketing and advertising, reasonable consumers believe that the Product contains only "Natural" ingredients and "100% premium ingredients" and is therefore free from chemicals which are known to cause harm to humans.

***PFAS Chemicals and Associated Risks***

33.    PFAS are a category of highly persistent and potentially harmful <u>man-made chemicals</u>.[8]

34.    PFAS are <u>not naturally occurring</u>.[9] They were first developed by scientists in the 1940s.[10] Thus, they are indisputably "artificial" and not "Natural."

35.    These man-made PFAS chemicals are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

36.    PFAS are frequently categorized as "long-chain" or "short-chain" depending on the number of carbon atoms present. While both long and short-chain PFAS are persistent in human bodies and the environment, long-chain PFAS are more toxic relative to their short-chain counterparts.[11] Long-chain varieties of PFAS include, among others, perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").[12]

37.    PFOS and PFOA are some of the most widely studied types of PFAS, with numerous studies showing a wide range of negative health effects in humans related to exposure. These health concerns were the impetus for a 2006 voluntary agreement between the

---

[8] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (Last Accessed November 18, 2022)

[9] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Last Accessed November 18, 2022)

[10] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/ (Last Accessed November 18, 2022)

[11] https://www.waste360.com/pfas-pfoas/pfas-carbon-chain-length-it-just-number-or-it (Last Accessed March 15, 2023)

[12] *Id*.

CLASS ACTION COMPLAINT

Environmental Protection Agency ("EPA") and eight major chemical manufacturers to phase out their production in the United States.[13]

38.    Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing a Product represented as natural would not expect it to contain harmful man-made chemicals, such as PFAS.[14]

39.    PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

40.    The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:"[15]

    a.  Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

    b.  Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

    c.  Increased risk of some cancers, including prostate, kidney, and testicular cancers.

    d.  Reduced ability of the body's immune system to fight infections, including reduced vaccine response.

    e.  Interference with the body's natural hormones.

    f.  Increased cholesterol levels and/or risk of obesity.

41.    A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[16]

---

[13]  https://www.theguardian.com/us-news/2019/may/23/pfas-everyday-products-toxics-guide (Last Accessed March 15, 2023)

[14]  *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives,  https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092  (Last Accessed November 18, 2022)

[15]  https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (Last Accessed November 18, 2022)

[16]  *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17



18   42.    The EEA article further explained that "[p]eople most at risk of adverse health

19 impacts are those exposed to high levels of PFAS, and vulnerable population groups such as

20 children and the elderly."[17]

21   43.    The dangers of PFAS chemicals are well known. On September 20, 2020, a *New*

22 *York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their

23 Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood

24 development:[18]

25   44.    Scientists think these widely used industrial chemicals may harm pregnant women

26

27   [17] *Id.*

28   [18] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

CLASS ACTION COMPLAINT

and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[19]

45.    PFAS in products which are frequently consumed by children, such as fruit juices, is particularly concerning, as children may be more sensitive to the harmful effects of chemicals such as PFAS.[20] Their immature organs and systems are more susceptible to damage, and children's ability to detoxify and eliminate toxics is variable.[21]

46.    Some of the reported health consequences of PFAS disproportionately affect children. Specifically, exposure to PFAS has been shown to affect growth, learning, and behavior in infants and older children.

47.    PFAS have also been shown to weaken children's immune systems during a critical period of development.[22] Specifically, there is strong evidence that exposure to PFAS in infancy and early childhood diminishes childhood antibody vaccination response, as well as some indication of increased risk of childhood infectious diseases.[23]

48.    In 2021, researchers found that early childhood exposure to PFAS in early life may disrupt neurodevelopment, with potential adverse impacts to children's behavior and executive function.[24]

49.    A study published in the International Journal of Environmental Research and Public Health found consistent evidence for PFAS' association with negative health outcomes in

---

[19] *Id.*

[20] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (Last Accessed November 18, 2022)

[21] http://ncchild.org/wp-content/uploads/2020/02/1.22.20_PFAS-Impact-on-Children-Fact-sheet_Final-draft.pdf (Last Accessed November 18, 2022)

[22] https://www.mottchildren.org/posts/your-child/pfas-contamination; Stolber, T., "PFAS chemicals harm the immune system, decrease response to vaccines, new ewg review finds," Environmental Working Group, June 21, 2019. (Last Accessed November 18, 2022)

[23] https://www.sciencedirect.com/science/article/pii/S2405844021022635; von Holst, H. et. al., Perfluoroalkyl substances exposure and immunity, allergic response, infection, and asthma in children: review of epidemiologic studies. (Last Accessed November 18, 2022)

[24] https://www.sciencedirect.com/science/article/pii/S0013935121009154; Harris, M. et. al., Prenatal and childhood exposure to per-and polyfluoroalkyl substances (PFAS) and child executive function and behavior problems. (Last Accessed November 18, 2022)

CLASS ACTION COMPLAINT

children, including dyslipidemia, renal dysfunction, and early onset of puberty.[25]

50.     It is increasingly understood that exposure to environmental chemicals during sensitive windows of development has the potential to permanently alter a child's risk of future adverse outcomes, even at doses that have little effect in adults.[26] According to children's environmental health experts, even "minuscule amounts of these exposures [to PFAS] can have serious and lifelong consequences [for children]."[27]

51.     According to the Environmental Protection Agency ("EPA"), limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[28]

52.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[29]

53.     Certain technologies have been found to remove PFAS from drinking water, especially PFOA and PFOS. These technologies include activated carbon adsorption, ion exchange resins, and high pressure membranes.[30] These technologies can be used in drinking water treatment facilities, in water systems in hospitals or individual buildings, or even in homes at the point-of-entry or point-of-use.

54.     Given the deleterious effects of PFOA and PFOS on the body and environment,

---

[25] *Id*.

[26] Rappazzo, Kristen M et al. "Exposure to Perfluorinated Alkyl Substances and Health Outcomes in Children: A Systematic Review of the Epidemiologic Literature." *International journal of environmental research and public health* vol. 14,7 691. 27 Jun. 2017, doi:10.3390/ijerph14070691 (Last Accessed November 18, 2022)

[27] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (Last Accessed November 18, 2022)

[28] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (Last Accessed November 18, 2022)

[29] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (Last Accessed November 18, 2022)

[30] https://www.epa.gov/sciencematters/reducing-pfas-drinking-water-treatment-technologies (Last Accessed March 15, 2023).

CLASS ACTION COMPLAINT

they are the most commonly studied[31] and commonly regulated.

55.    A November 2012 research report on "Durable Water and Soil repellent chemistry in the textile industry," explained:

> PFOA and PFOS, the most widely known and studied long-chain PFAAs, have been shown to be persistent in the environment, have long elimination half-life in wildlife and humans, and have toxicological properties of concern. Due to these properties, regulatory actions have been put in place or are being considered in several countries to manage these substances.

56.    "The ubiquitous presence of certain long-chain perfluoroalkyl acids (PFAAs), including PFOS, is of concern, given their potential to be persistent, bioaccumulative, and toxic."[32]

57.    Consequently, "[t]he recognition of these hazardous properties and global distribution has led the scientific, regulatory and industrial communities to engage in international efforts to curb the production and uses of long-chain PFASs."[33]

58.    Importantly, "PFOS has been phased out of production and/or commerce in Canada and the United States since 2000–2002, *prohibited from manufacture and most uses in European Union countries since 2008* (Directive 2006/122/EC)."

59.    On November 10, 2017, PFOA and PFOS were added to the list of chemicals known to the state of California to cause reproductive toxicity.

60.    Defendant is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Product is free from artificial ingredients.

61.    Defendant has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Product is superior to other products that are not "Natural" or do not have the same purported health benefits.

62.    Reasonable consumers purchasing the Product would believe, based on Defendant's representations, that the Product does not contain artificial, synthetic or man-made

---

[31] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html
[32] CEC. 2017. Furthering the Understanding of the Migration of Chemicals from Consumer Products – A Study of Per- and Polyfluoroalkyl  Substances (PFASs) in Clothing, Apparel, and Children's Items. Montreal, Canada: Commission for Environmental Cooperation. 201 pp.
[33] *Id.*

CLASS ACTION COMPLAINT

1    chemicals that could adversely impact their health.

2    ***Plaintiffs' Independent Testing Confirms the Presence of PFAS Chemicals in the Product***

3        63.    Plaintiffs sought independent third-party testing to determine whether the Product

4    contained PFAS chemicals.

5        64.    Plaintiffs' independent testing was conducted in accordance with accepted industry

6    standards for detecting the presence of PFAS.

7        65.    Plaintiffs' testing detected material levels of numerous PFAS chemicals in the

8    Product, including concerning levels of Perfluorooctanoic acid ("PFOA"), a long-chain PFAS that

9    has been linked to serious health problems such as cancer[34] and Perfluorooctanesulfonic acid

10   ("PFOS").

11       66.    In addition, Plaintiff's testing detected material levels of PFAS chemicals in the

12   Product, including significant levels of including concerning levels of Perfluoro-1-butanesulfonic

13   acid ("PFBS"), Perfluorohexanesulfonic acid ("PFHxS"), Perfluoro-n-decanoic acid ("PFHpA"),

14   Perfluoro-n-hexanoic acid ("PFHxA"), and Perfluoro-n-pentanoic acid ("PFPeA").

15   ***Ingestion of Any Amount PFOA or PFOS Creates Significant Health Risks***

16       67.    PFOA and PFOS, which were discovered in the Product, are two of the most well-

17   studied types of PFAS, and have been indisputably linked to negative health effects.[35]

18       68.    Human epidemiology studies have found associations between PFOA and PFOS

19   exposure and effects on the immune system, the cardiovascular system, human development (e.g.,

20   decreased birth weight), and cancer. The most sensitive non-cancer effect and the basis for the

21   updated health advisories for PFOA and PFOS is suppression of vaccine response in children.[36]

22       69.    The EPA recently confirmed that the levels at which negative health effects could

23   occur are much lower than previously understood– including **near zero** in some cases.[37]

24

---

25   [34]    https://www.cancer.org/healthy/cancer-causes/chemicals/teflon-and-perfluorooctanoic-acid-pfoa.html (Last Accessed March 15, 2023)

26   [35] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html  (Last Accessed November 18, 2022)

27   [36]    https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (Last Accessed November 18, 2022)

28   [37] *Id.*

CLASS ACTION COMPLAINT

70.    In other words, there is no "safe" level of exposure with regard to these chemicals, and even "trace" levels of PFAS can pose a risk to humans.

71.    The amounts of PFOA and PFOS (and other PFAS for that matter) found within the Products are not trace and well above what is considered trace by any available standard.

72.    Based on new data from human studies, which demonstrate the danger of extremely low levels of exposure, the EPA recently tightened its lifetime health advisory levels for exposure to certain PFAS in drinking water. For PFOA, the recommendation is 0.004 part per trillion (ppt).[38] For PFOS, the recommendation is 0.02 ppt.

73.    Furthermore, on March 14, 2023, the EPA announced that due to its new understanding that almost no level of exposure to PFOA is sufficient to avoid substantial health risks, the government intends to set enforceable limits that will require near-zero levels of PFOA in the nation's drinking water.[39]

74.    Plaintiffs' testing has revealed the Product contains PFOA in amounts **more than 7 times** the EPA's current recommended levels of exposure. PFOS was present in amounts **more than twice** the EPA's current recommended levels of exposure.

75.    Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers, the majority of whom are children, to toxic synthetic chemicals at levels far beyond what the EPA deems safe.

76.    In view of the serious health risks associated with exposure to PFAS and PFOA, the quantity of PFAS in the Product is significant.

***Defendant's Unlawful Conduct***

77.    At all times relevant to this action Defendant knew, or at minimum should have known, that its Product contains PFAS.

78.    To capitalize on increasing consumer demand for products free from artificial ingredients, including harmful man-made chemicals like PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its Product from in the highly competitive

---

[38] *Id.*
[39] https://www.nytimes.com/2023/03/14/climate/epa-water-pfas-chemicals.html

juice market by marketing the Product to conscientious consumers as an orange juice that is free from artificial ingredients.

79.    Consequently, reasonable consumers believe the Product is free of artificial, man-made chemicals known to harm human health.

80.    Defendant's wellness-focused business strategy is supported by current market research. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[40]  Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[41]

81.    At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices. One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[42]

82.    Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[43]

83.    Therefore, current research demonstrates, and Defendant's marketing strategy supports, that the presence of harmful chemicals in food and beverages is material to reasonable consumers.

84.    Defendant's strategy to stay aligned with consumer preferences to retain a competitive advantage in the marketplace, which includes representing to sell natural juice

---

[40] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-topfood-safety-concern-among-consumers/ (Last Accessed November 18, 2022)
[41] Id.
[42] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (Last Accessed November 18, 2022)
[43] Made Safe, "What Shoppers Want," at 3.

beverages which do not contain artificial ingredients in above trace amounts, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Product.

85.    The use of PFAS is not a normal part of agriculture or food preparation, unlike pesticides and other chemicals involved in food processing. Instead, FDA has found that the "[n]o PFAS have been detected in over 97% (701 out of 718) of the fresh and processed foods tested" through their Total Diet Study. *See* *https://www.fda.gov/food/environmental-contaminants-food/and-polyfluoroalkyl-substances-pfas*. Accordingly, it would not be something expected in "Natural" and "100% Premium Orange Juice." This is particularly true because consumers have shown an aversion to PFAS used in other "premium" food related products, such as pots and pans.

86.    If Defendant employed appropriate safety and quality standards, they should have known of the presence of PFAS in its Product.

87.    Consumers lack the expertise to ascertain the true ingredients in the Product prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to accurately and honestly advertise its Product's ingredients as "Natural," and not contradict those representations by using artificial man-made chemicals in its Product that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

88.    Defendant's representations that the Product is free of artificial ingredients, including *inter alia*, the Natural Representations described herein, are false because products containing toxic, man-made ingredients like PFAS are not natural by any possible definition of the term.

89.    Defendant's representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiffs and Class members, regarding the presence of PFAS chemicals in its Product. Accordingly, these acts and practices by Defendant are deceptive.

90.    Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Product would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

91.     Plaintiffs and putative Class Members had no reasonable means of discovering the presence of PFAS in the Product prior to their purchase.

92.     Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Product worthless or less valuable.

93.     If Defendant had disclosed to Plaintiffs and putative Class Members that its Product contained PFAS chemicals, Plaintiffs and putative Class Members would not have purchased the Product, or they would have paid less for it.

94.     Plaintiffs and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

95.     Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

96.     The materiality of the representations described herein also establishes causation between Defendant's conduct and the injuries Plaintiffs and the Class Members sustained.

97.     Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Product using the "Natural," health-focused representations in order to profit off of unsuspecting consumers, including Plaintiffs and Class Members.

98.     The presence of PFAS chemicals in Defendant's Product is entirely inconsistent with its uniform representations.

99.     Defendant's knowingly false and misleading representations and omissions have the intended result of convincing reasonable consumers that its Product is without "chemical" or "artificial" ingredients and therefore do not contain artificial, man-made, toxic chemicals. No reasonable consumer would consider Defendant's Product as being an "Natural," healthy orange juice if they knew that the Product contained harmful, artificial PFAS chemicals.

100.    Defendant's false, misleading, and deceptive representations and omissions, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiffs and Class Members.

101.    In making the false, misleading, and deceptive representations, Defendant knew intended consumers would pay a premium for the Product over comparable products that are made from or contain synthetic or artificial ingredients.

102.    Plaintiffs and Class Members all paid money for the Product; however, they did not obtain the full value of the advertised Product due to Defendant's misrepresentations and material omissions as detailed herein. Plaintiffs and Class Members purchased, purchased more of, or paid more for, the Product than they would have had they known the truth about the Product's artificial, man-made, and harmful ingredients. Thus, Plaintiffs and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

103.    Defendant's widespread marketing campaign portraying the Product as containing "Natural" and healthy ingredients as detailed herein, is misleading and deceptive to consumers because the Product is made with artificial, man-made, and toxic ingredients. Plaintiffs bring this action on behalf of the proposed Classes to stop Defendant's misleading practices.

**PFAS Renders the Product Adulterated, Misbranded and Illegal to Sell**

104.    The Product is used as a drink for humans and is therefore a "food" which is regulated by the U.S. Food and Drug Administration. *See* 21 U.S.C. § 321(f).

105.    The Federal Food, Drug & Cosmetic Act ("FDCA") establishes numerous regulations regarding the safety of food sold to consumers, including various labeling requirements.

106.    Under the FDCA, a food is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." *See* 21 U.S.C. § 342(a)(1). Even in the event that a poisonous or deleterious substance is not an "added" substance (such as in the case of unintended contamination), food is still deemed adulterated if the quantity of the substance renders it injurious to health. *Id*.

107.    As detailed herein, PFAS, and specifically the PFOA and PFOS found in Defendant's Product, is indisputably linked to negative health consequences and is therefore a

"poisonous or deleterious substance."

108.    Furthermore, PFOA and PFOS that were discovered in Defendant's Product at levels that are, at minimum, more than double times the EPA's recommended limit for drinking water, which supports a finding that even if the PFOA and PFOS is present due to contamination, it is still present in the Product at levels that are injurious to health.

109.    The FDA has not established any tolerances for PFAS in food. *See* 21 U.S.C. § 346.

110.    The FDCA does permit the limited use of PFAS in food contact applications, such as its use as a resin in forming gaskets, O-rings, and other parts of food processing equipment. This is due, in part, to the minimal risk of PFAS migrating from food processing equipment into the food itself.[44] However, as a result of studies which questioned the safety of long-chain PFAS such as PFOS and PFOA, the FDA worked with manufacturers beginning in the early 2000s to discontinue the use of long-chain PFAS chemicals in food contact applications.[45] In 2016, the FDA revoked regulations authorizing the remaining use of PFOS and PFOA in food contact applications. As of November 2016, long-chain PFAS like PFOS and PFOA are no longer used in food contact applications sold in the United States.[46]

111.    Accordingly, *there is no use of PFOA and PFOS that are currently permitted by the FDA*.

112.    Thus, regardless of the source of PFAS in the Product, it is nevertheless "adulterated" by virtue of the significant levels of toxic PFOS and PFOA present.

113.    Under the FDCA, a food is deemed "misbranded" if "its labeling is false or misleading in any particular." *See* 21 U.S.C. § 343(a).

114.    The Product is misbranded because its labeling is false and misleading insofar as it purports to be "Natural" and does not disclose the presence of PFAS that are present in above trace amounts.

---

[44]    https://www.fda.gov/food/process-contaminants-food/authorized-uses-pfas-food-contact-applications (Last visited March 14, 2023)
[45] *Id*.
[46] *Id*.

115.    Food that is deemed "adulterated" or "misbranded" may not be manufactured, distributed or sold in the United States. *See* 21 U.S.C. § 331. Adulterated and misbranded products thus have no economic value and are legally worthless.

116.    The mere presence of PFOA and PFOS in the Product renders it adulterated and misbranded.

117.    As alleged herein, Defendant has violated the FDCA, the California Consumer Legal Remedies Act ("CLRA"), and consumer protection statutes. Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding PFAS contamination affecting the Product.

118.    If Defendant had disclosed to Plaintiffs and putative Class Members that the Product contained or risked containing PFAS and thus risked exposing consumers to PFAS, Plaintiffs and putative Class Members would not have purchased the Product or they would have paid less for the Product.

119.    As a seller of a food product, Defendant had and has a duty to ensure that its Product did not and does not contain excessive (or any) level of toxic contaminants such as PFAS, including through regular testing, especially before the Product is injected into the stream of commerce for consumers to consume.

120.    But based on Plaintiffs' independent testing results set forth above, Defendant made no reasonable effort to test its Product for PFAS. Nor did it disclose to Plaintiffs in any advertising or marketing that its Product contained PFAS, let alone at levels that are many multiples of the lifetime advisory limit set by the EPA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was "Natural," that it was of merchantable quality, complied with federal and state law, and did not contain dangerous substances such as PFAS.

## PLAINTIFFS' FACTUAL ALLEGATIONS

a) **Anne Foster**

121.    Plaintiff Anne Foster is a citizen and resident of the state of California. Plaintiff Foster has purchased the Product for years; however, she purchased the Product as recently as June 2023 and consumed Defendant's Product that contained PFAS. Plaintiff Foster paid approximately

$4.50 for the Defendant's Product and purchased it numerous times at her grocery store, Raley's, in Sonoma County.

122.    Prior to her purchase, Plaintiff Foster reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein. Thus, Plaintiff Foster understood that based on Defendant's claims, the Product was safe for use and was an orange juice beverage containing "Natural" ingredients and thus was free of harmful, man-made chemicals like PFAS. Plaintiff Foster reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product or would not have purchased it on the same terms if the true facts had been known.

123.    As a direct result of Defendant's material misrepresentations and omissions, Plaintiff Foster suffered and continues to suffer, economic injuries.

124.    Plaintiff Foster continues to desire to purchase the Product from Defendant if she can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff Foster is unable to determine if Defendant's Product is actually "Natural" and free of harmful chemicals like PFAS in the future. Plaintiff Foster understands that the composition of the Product may change over time, but as long as Defendant may freely advertise the Product as safe, natural, or healthy when it actually contains material levels of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's products, which *are* in fact Natural and free of PFAS.

**b)  Madeleine Rogow**

125.    Plaintiff Madeleine Rogow is a citizen and resident of the state of California. Plaintiff Rogow has purchased the Product for years; however, she purchased the Product as recently as May 2023 and consumed Defendant's Product that contained PFAS. Plaintiff Rogow paid approximately $4 for the Defendant's Product and purchased it numerous times at various

retail stores including Ralphs, Whole Foods, and Amazon Fresh in Los Angeles County, California.

126.    Prior to her purchase, Plaintiff Rogow reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein. Thus, Plaintiff Rogow understood that based on Defendant's claims, the Product was safe for use and was an orange juice beverage containing "Natural" ingredients and thus was free of harmful, man-made chemicals like PFAS. Plaintiff Rogow reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product or would not have purchased it on the same terms if the true facts had been known.

127.    As a direct result of Defendant's material misrepresentations and omissions, Plaintiff Rogow suffered and continues to suffer, economic injuries.

128.    Plaintiff Rogow continues to desire to purchase the Product from Defendant if she can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff Rogow is unable to determine if Defendant's Product is actually "Natural" and free of harmful chemicals like PFAS in the future. Plaintiff Rogow understands that the composition of the Product may change over time, but as long as Defendant may freely advertise the Product as safe, natural, or healthy when it actually contains material levels of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's products, which *are* in fact Natural and free of PFAS.

**INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM**

129.    Defendant's wrongful conduct harms the public-at-large.

130.    PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

131.    PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

132.    Because Defendant's deceptive advertising is ongoing and directed to the public, and because Defendant continues to sell its Product containing PFAS chemicals, the deception poses an ongoing risk to the public.

133.    As such, a public injunction must be provided in order to enjoin Defendant's continued harm of consumers and the public-at-large.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

134.    Defendant had actual knowledge that its Product contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

135.    Although Defendant was aware of the deception in their advertising, marketing, packaging, and sale of the Product given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiffs or Class Members that its Product contained PFAS chemicals.

136.    Despite its knowledge, Defendant has fraudulently misrepresented the Product as having qualities and characteristics it does not, while concealing the fact that its Product contains PFAS chemicals.

137.    Defendant made, and continue to make, affirmative false statements and misrepresentations to consumers, and continue to omit the fact that the Product contains PFAS, to promote sales of its Product.

138.    Defendant misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Product. Defendant's misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

139.    The PFAS chemicals in the design and/or manufacture of Defendant's Product was

not reasonably detectible to Plaintiffs and Class Members.

140.    At all times, Defendant actively and intentionally misrepresented the qualities and characteristics of the Product, while concealing the existence of the PFAS chemicals and failing to inform Plaintiffs or Class Members of the existence of the PFAS chemicals in its Product. Accordingly, Plaintiffs' and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

141.    Defendant's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Product contained artificial, man-made PFAS chemicals.

142.    Defendant misrepresented the Product and concealed the PFAS chemicals for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

143.    As a result of Defendant's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiffs and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Product.

144.    Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Product contained PFAS chemicals. Plaintiffs and Class Members had no realistic ability to discern that the Product contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the Product.

**FEDERAL RULE OF CIVIL PROCEDURE 9(B) ALLEGATIONS**

145.    Although Defendant is in the best position to know what content it placed on its packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Product to Plaintiffs and consumers, to the extent necessary, Plaintiffs

satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

146. **WHO**: Defendant made its "Natural" and other health-focused representations on the Product's packaging, online, and its marketing and advertising of the Product.

147. **WHAT**: Defendant's conduct here was, and continues to be, deceptive and fraudulent because of its "Natural" and health-focused representations. Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Product was manufactured and sold with the represented qualities. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market the Product as possessing qualities they do not have.

148. **WHEN**: Defendant made material misrepresentations, false statements and/or material omissions during the putative Class periods and at the time Plaintiffs and Class Members purchased the Product, prior to and at the time Plaintiffs and Class Members made claims after realizing the Product contained artificial, man-made chemicals, and continuously throughout the applicable Class periods.

149. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Product's packaging, as well as on the official website used to market and advertise the Product.

150. **HOW**: Defendant made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Product.

151. **WHY**: Defendant made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Product over other brands that did not make similar "Natural" and health-focused representations, the effect of which was that Defendant profited by selling the Product to many thousands of consumers.

152. **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have, absent Defendant's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class**: During the fullest period allowed by law, all persons who purchased the Product within the United States for personal use and not for resale.

> **California Subclass**: During the fullest period allowed by law, all persons who purchased the Product within the State of California for personal use and not for resale.

154.    Members of the classes described are referred to herein as "Class Members" or members of the "Class."

155.    Plaintiffs reserve the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

156.    The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

157.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiffs do not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Product nationally, the members of the Class are so numerous that their individual joinder herein is impracticable. Plaintiffs are informed and believes that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous

that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

158.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

      a.    Whether Defendant misrepresented, omitted, and/or failed to disclose material facts concerning the Product;

      b.    Whether Defendant's' conduct was unlawful; unfair; fraudulent and/or deceptive;

      c.    Whether Defendant breached express warranties to Plaintiffs and Class Members;

      d.    Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the proposed Class;

      e.    Whether Plaintiffs and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiffs seek to enforce on behalf of themselves and the other Members of the proposed Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

159.    **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendant's uniform misconduct described herein. Further, there are no defenses available to Defendant that are unique to Plaintiffs or to any

CLASS ACTION COMPLAINT

particular Members of the Class.

160. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Members of the Class he seeks to represent; they have retained counsel competent and experienced in complex class action litigation; and they will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and the undersigned counsel.

161. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

162. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Members of the Class could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CAUSES OF ACTION**

**COUNT I**
**Violation Of Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq*.**
**(On Behalf of Plaintiffs and the National Class and Alternatively the California Subclass)**

163.    Plaintiffs repeat and re-allege all previous paragraphs, as if fully included herein.

164.    As previously alleged, this Court has original jurisdiction over this matter based upon the requirements of CAFA; therefore, the Court has alternate jurisdiction over Plaintiffs' Magnuson-Moss claim.

165.    The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

166.    Plaintiffs and the National Class members are consumers as defined in 15 U.S.C. § 2301(3) and utilized the Product for personal and household use and not for resale or commercial purposes.

167.    Plaintiffs purchased the Product costing more than $5 and their individual claim is greater than $25 as required by 15 U.S.C. §§ 2302(e) and 2310(d)(3)(A).

168.    Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

169.    The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

170.    The MMWA provides a cause of action for breach of warranty, including the violation of express and implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1).

171.    Defendant has breached the implied warranties of merchantability by failing to provide merchantable goods. The Product at issue is not merchantable or fit for its ordinary purposes because the Product contains ingredients that render the Product as not being "Natural" by definition.

172.    Therefore, Defendant's Product is not merchantable or fit for its ordinary purposes because it not "Natural" given it contains man-made and synthetic PFAS.

173.    Defendant violated the express warranty because despite claiming it is "Natural", it does not contain Natural ingredients because it contains a non-trace amount of PFAS chemicals

that renders the Product not Natural. Hence, it breached the express warranty by making said representation.

174.    In its capacity as warrantor, and by the conduct described herein, any attempt by Defendant to limit the warranties in a manner that it does is not permitted by law.

175.    By Defendant's conduct as described herein, Defendant has failed to comply with their obligations under their implied promises, warranties, and representations.

176.    Plaintiffs and the National Class fulfilled their obligations under the implied warranties and express warranties for the Product.

177.    As a result of Defendant's breach of warranties, Plaintiffs and the National Class are entitled to revoke their acceptance of the Product, obtain damages, punitive damages, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2301.

**<u>COUNT II</u>**
**Violation Of The California Consumer Legal Remedies Act**
**("CRLA"), Civil Code §§ 1750, *et seq.***
**(On Behalf Of Plaintiffs And The California Class)**

178.    Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege all previous paragraphs as if fully included herein.

179.    The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq*.

180.    The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

181.    Plaintiffs and California Class Members are "consumers" as defined by Civil Code § 1761(d).

182.    Defendant is a "person" as defined by Civil Code § 1761(c).

183.    The Product qualifies as a "good" as defined by Civil Code § 1761(a).

184.    Plaintiffs and the California Class Members' purchases of the Product are "transactions" as defined by Civil Code § 1761(e).

185.    As set forth below, the CLRA deems the following **unfair** methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

(a)    "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

(b)    "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

(c)    "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and

(d)    "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

186.    Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code § 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Product has benefits or characteristics that they did not actually have.

187.    As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA and has made representations regarding Product's benefits or characteristics that they did not in fact have, and represented the Product to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiffs and California Class Members.

188.    The Product is not nutritious, healthy, or safe for human consumption, and therefore is of an inferior quality and trustworthiness compared to other products in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that the Product meets a certain standard or quality.

189.    The mere presence of PFOA and PFOS in the Product renders it adulterated and

misbranded and in violation of the CLRA.

190.    As detailed above, Defendant violated the CLRA when it advertised the Product with the intent not to sell it as advertised and knew that the Product was not as represented.

191.    Specifically, Defendant marketed and represented the Product with the Natural representations and other representations described herein, when in fact no reasonable consumer would believe the products to be nutritious, healthy, or "good" if they knew they contained a potentially harmful chemical such as PFAS, and where not natural.

192.    Defendant's deceptive practices were specifically designed to induce Plaintiffs and California Class Members to purchase or otherwise acquire the Product.

193.    Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the Product manufactured by Defendant. Defendant's packaging, advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the quality, safety, and reliability of the Product.

194.    Despite these Natural representations, Defendant also omitted and concealed information and material facts from Plaintiffs and California Class Members.

195.    In their purchase of the Product, Plaintiffs and California Class Members relied on Defendant's representations and omissions of material facts.

196.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

197.    Pursuant to Cal. Civ. Code § 1782, Plaintiffs notified Defendant in writing by certified mail sent on or about June 12, 2023, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above and give notice to all affected consumer of Defendant's intent to do so. Defendant replied to Plaintiffs on July 21, 2023 and denied all of the allegations in Plaintiffs' demand letter. The parties had an additional call together and Defendant indicated it had no intention of meeting the demands made by Plaintiffs in their June 12, 2023 correspondence.

198.    In accordance with Civil Code § 1780(a), Plaintiffs and the other California Class

Members seek all available damages, injunctive and equitable relief, and all other remedies available for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

### COUNT III
**Violations of the California Unfair Competition Law**
**("UCL"), Cal. Bus. & Prof. Code §§ 17200, Et Seq.**
**(On Behalf Of Plaintiffs And The California Class)**

199.    Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege all previous paragraphs as if fully included herein.

200.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

201.    Plaintiffs and Class Members bring this action against Defendant for unfair, illegal, and fraudulent business practices under the UCL.

202.    Plaintiffs and Class Members who purchased Defendant's Product suffered an injury by virtue of buying products in which Defendant misrepresented and/or omitted the Product's true quality, reliability, safety, and use.

203.    Had Plaintiffs and Class Members known that Defendant materially misrepresented the Product and/or omitted material information regarding the Product, they would not have purchased the Product.

204.    Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this complaint.

205.    There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Product.

206.    Plaintiffs and Class Members who purchased Defendant's Product had no way of reasonably knowing that the Product was deceptively packaged, marketed, advertised, and labeled, was not safe for human consumption, and was unsuitable for its intended use as a juice beverage. Thus, Plaintiffs and California Class Members could not have reasonably avoided the harm they suffered.

207.    Specifically, Defendant marketed, labeled, and represented the Product with the Natural representations and other representations described herein, when in fact the Product

contains PFAS, which no reasonable consumer would believe was in products represented as "Natural," nutritious, healthy, and containing significant health benefits.

208. The gravity of the harm suffered by Plaintiffs and Class Members who purchased Defendant's Product outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Product in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiffs and California Class Members.

209. The mere presence of PFOA and PFOS in the Product renders it adulterated and misbranded and a violation of the UCL.

210. The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiffs and Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Product and thus were violations of Cal. Bus. & Prof. Code §§ 17500, et seq.

211. Defendant has violated the UCL's proscription against engaging in unlawful business practices as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

212. Defendant has also violated the UCL's proscription against engaging in unfair business practices. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

213. Defendant has further violated the UCL's proscription against engaging in fraudulent business practices. Defendant's claims, nondisclosures and misleading statements

with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

214.    Plaintiffs and the other Class Members suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

215.    Additionally, Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the Subclass. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

216.    As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.

## COUNT IV
### Violation Of The California False Advertising Law ("FAL")
### California Business And Professions Code §§ 17500, *et seq*.
### (On Behalf Of Plaintiffs and The California Class)

217.    Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege all previous paragraphs as if fully included herein.

218.    The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

219.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or

personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

220.    Specifically, Defendant marketed, labeled, and represented the Product with the Natural representations and other misrepresentations described herein, when in fact the Product contains PFAS, which no reasonable consumer would believe was in products represented as "Natural," nutritious, healthy, and containing significant health benefits.

221.    At the time of its misrepresentations, Defendant was either aware that Product contained PFAS, which no reasonable consumer would expect would be in products with the Natural representations, or was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendant concealed and omitted and failed to disclose this information to Plaintiffs and California Class Members.

222.    Defendant's descriptions of the Product were false, misleading, and likely to deceive Plaintiffs and other reasonable consumers.

223.    Defendant's conduct therefore constitutes deceptive or misleading advertising.

224.    Plaintiffs have standing to pursue claims under the FAL as they reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding the Product when selecting and purchasing the Product.

225.    In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of the Product, Plaintiffs and California Class Members purchased the Product.

The mere presence of PFOA and PFOS in the Product renders it adulterated and misbranded and in violation of the FAL.

226.    Had Defendant disclosed the true nature of the Product (that it contain PFAS), Plaintiffs and California Class Members would not have purchased the Product or would have paid substantially less for it.

227.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from

Plaintiffs and California Class Members who paid for the Product, which contained harmful chemicals and was therefore not healthy or nutritious.

228.    Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the Subclass. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

229.    Plaintiffs and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant and by means of its deceptive or misleading representations, including monies already obtained from Plaintiffs and California Class Members as provided for by the California Business and Professions Code § 17500.

## COUNT V
**Breach Of Implied Warranty Under The Song-Beverly Act, Cal. Civ. Code §§ 1790,** *et seq.*
**And California Commercial Code § 2314**
**(On Behalf Of Plaintiffs and The California Class)**

230.    Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege all previous paragraphs as if fully included herein.

231.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

232.    The Product at issue here is a "consumer goods[]" within the meaning of Cal. Civ. Code § 1791(a).

233.    Plaintiffs and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

234.    Defendant is in the business of manufacturing and/or producing the Product and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

235.    Defendant impliedly warranted to retailer buyers that the Product was merchantable in that it would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Product is used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Product was unsafe for consumption due to its inclusion of PFAS. Therefore, the Product would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which it is used.

236.    Plaintiffs and Class Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

237.    The Product was not altered by Plaintiffs or the Class Members.

238.    The Product was defective at the time of sale. The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

The mere presence of PFOA and PFOS in the Product renders it adulterated and misbranded and in violation of Cal. Civ. Code § 1790.

239.    Defendant knew that the Product would be purchased and used without additional testing by Plaintiffs and Class Members.

240.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that it was unfit for use and posed a significant safety risk.

241.    On June 12, 2023 prior to the filing of this Complaint, Plaintiffs sent Defendant a notice letter, apprising Defendant of its breach of warranties as described herein. The letter was sent to Defendant's counsel and California registered agent advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations. The letter

stated that it was sent on behalf of all other similarly situated purchasers.

242.    Plaintiffs and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

<u>**COUNT VI**</u>
**Breach of Express Warranty**
**(Plaintiffs on Behalf of the National Class)**

243.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

244.    Plaintiffs and Class Members formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Product.

245.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

246.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

247.    As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is "Natural."

248.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

249.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs' and Class Members' decision to purchase the Product.

250.    Plaintiffs and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Product.

251.    Plaintiffs and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

252.    Defendant thereby breached the following state warranty laws:

a.    Code of Ala. § 7-2-313;

CLASS ACTION COMPLAINT

| | | |
|---|---|---|
| 1 | b. | Alaska Stat. § 45.02.313; |
| 2 | c. | A.R.S. § 47-2313; |
| 3 | d. | A.C.A. § 4-2-313; |
| 4 | e. | Cal. Comm. Code § 2313; |
| 5 | f. | Colo. Rev. Stat. § 4-2-313; |
| 6 | g. | Conn. Gen. Stat. § 42a-2-313; |
| 7 | h. | 6 Del. C. § 2-313; |
| 8 | i. | D.C. Code § 28:2-313; |
| 9 | j. | Fla. Stat. § 672.313; |
| 10 | k. | O.C.G.A. § 11-2-313; |
| 11 | l. | H.R.S. § 490:2-313; |
| 12 | m. | Idaho Code § 28-2-313; |
| 13 | n. | 810 I.L.C.S. 5/2-313; |
| 14 | o. | Ind. Code § 26-1-2-313; |
| 15 | p. | Iowa Code § 554.2313; |
| 16 | q. | K.S.A. § 84-2-313; |
| 17 | r. | K.R.S. § 355.2-313; |
| 18 | s. | 11 M.R.S. § 2-313; |
| 19 | t. | Md. Commercial Law Code Ann. § 2-313; |
| 20 | u. | 106 Mass. Gen. Laws Ann. § 2-313; |
| 21 | v. | M.C.L.S. § 440.2313; |
| 22 | w. | Minn. Stat. § 336.2-313; |
| 23 | x. | Miss. Code Ann. § 75-2-313; |
| 24 | y. | R.S. Mo. § 400.2-313; |
| 25 | z. | Mont. Code Anno. § 30-2-313; |
| 26 | aa. | Neb. Rev. Stat. § 2-313; |
| 27 | bb. | Nev. Rev. Stat. Ann. § 104.2313; |
| 28 | cc. | R.S.A. 382-A:2-313; |

CLASS ACTION COMPLAINT

dd.    N.J. Stat. Ann. § 12A:2-313;

ee.    N.M. Stat. Ann. § 55-2-313;

ff.    N.Y. U.C.C. Law § 2-313;

gg.    N.C. Gen. Stat. § 25-2-313;

hh.    N.D. Cent. Code § 41-02-30;

ii.    II. O.R.C. Ann. § 1302.26;

jj.    12A Okl. St. § 2-313;

kk.    Or. Rev. Stat. § 72-3130;

ll.    13 Pa. Rev. Stat. § 72-3130;

mm.    R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.    Utah Code Ann. § 70A-2-313;

ss.    9A V.S.A. § 2-313;

tt.    Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

## <u>COUNT VII</u>
### Fraud
### (Plaintiffs On Behalf of the National Class)

253.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

254.    At the time Plaintiffs and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as safe.

255.    Defendant affirmatively misrepresented the nature and quality of the Product,

giving the Product the appearance of being Natural and safe for human consumption.

256.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

257.    Defendant possessed superior knowledge as Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

258.    Plaintiffs and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

259.    Plaintiffs and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained exclusive control over knowledge of the true quality of the Product.

260.    Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

261.    Additionally, as a result of Defendant's willful and malicious conduct, punitive damages are warranted.

<u>**COUNT VIII**</u>
**Constructive Fraud**
**(Plaintiffs On Behalf of the Class)**

262.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

263.    At the time Plaintiffs and Class Members purchased the Product, Defendant falsely claimed the Product was "Natural" and did not disclose that the Product contains dangerous levels of PFAS.

264.    Defendant affirmatively misrepresented the nature of the Product, giving the Product the appearance of being natural, healthy, and otherwise safe for human consumption as detailed herein.

265.    Defendant also knew that its omissions and misrepresentations regarding the

Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

266.    Defendant had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiffs and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiffs and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

267.    Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature and quality of the Product.

268.    Plaintiffs and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

269.    Plaintiffs and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained exclusive control over knowledge of the true quality of the Product, and what information was available regarding the Product.

270.    Defendant breached their duty to Plaintiffs and Class Members to make full disclosures of the safety of their Product.

271.    Plaintiffs and Class Members sustained actual losses and damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, in a sum to be determined at trial.

**COUNT IX**
**Unjust Enrichment**
**(In the Alternative and On Behalf Of The National Class)**

272.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

273.    At all relevant times, Defendant was responsible for designing, formulating, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the

Product and its packaging. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class as the ultimate users of the Product.

274.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiffs and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

275.    Defendant as the designer, formulator, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiffs and the Class of all dangers associated with consumption of the Product.

276.    At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

277.    Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Product by Plaintiffs and the other members of the Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's representations regarding the quality or value of the Product were misleading to consumers, which caused injuries to Plaintiffs and the other members of the Class, because they would have not purchased the Product had they known the truth or would only have purchased the Product for a lower price.

278.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and the other members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the other members of the Class for its unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated members of the Class, pray for relief and judgment, including entry of an order, as follows:

(a)    Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

(b)     Directing that Defendant bear the costs of any notice sent to the Class;

(c)     A jury trial and damages according to proof;

(d)     Ordering Defendant to pay restitution to Plaintiffs and the Class if damages are not available;

(e)     Awarding actual damages to Plaintiffs and the Class;

(f)     Awarding Plaintiffs and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g)     Awarding attorneys' fees and litigation costs to Plaintiffs and members of the Class;

(h)     Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i)     Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial of the claims asserted in this Class Action Complaint.

Dated: September 18, 2023                    Respectfully submitted,

By: */s/ Trenton Kashima*
Trenton R. Kashima (SBN 291405)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

CLASS ACTION COMPLAINT

Jason P. Sultzer, Esq.*
Daniel Markowitz, Esq.*
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

Erin Ruben
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com

\* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT